The CITY OF NEW YORK, Plaintiff,

v.

EXXON CORP.; Exxon Research & Engineering Co., Inc.; Ingersoll-Rand Co.; Alcan Aluminum Corp.; Ford Motor Co.; Koppers Co., Inc.; BASF Wyandotte Corp.; Borg-Warner Corp.; Chrysler Corp.; United Technologies Corp.; Carrier Corp.; National Can Corp.; Public Service Electric & Gas Co.; Dana Corp.; and Refinemet International, Inc., formerly known as Ag-Met, Inc., Defendants.

No. 85 Civ. 1939 (EW).

United States District Court, S.D. New York.

April 24, 1986.

**612**

Lawrence A. Salibra, Alcan Aluminum Corp., Cleveland, Ohio, for defendant Alcan Aluminum Corp.

Leonard Marks, Gold, Farrell & Marks, New York City (Thomas L. Sivak, Koppers Co. Pittsburgh, Pa., of counsel), for defendant Koppers Co.

Johnnine Brown Hazard, Edward J. Kennedy, Bell, Boyd & Lloyd, Chicago, Ill., for defendant Borg-Warner Corp.

Leonard Marks, Gold, Farrell & Marks, New York City, Timothy A. Vanderver, Russell V. Randle, Patton, Boggs & Blow, Washington, D.C., for defendants United Technologies Corp., Carrier Corp.

C. MacNeil Mitchell, Breed, Abbott & Morgan, New York City, Norman W. Bernstein, Associate Counsel, Ford Motor Co., Dearborn, Mich., for defendant Ford Motor Co.

Joseph DiBenedetto, Margot Schonholtz, Cole & Deitz, New York City, for defendant Refinemet Intern., Inc.

Frederick A.O. Schwarz, Jr., Corp. Counsel, City of New York, New York City (Walter A. Kretz, Jr., James F. Simon, Christopher A. Amato, June Rose, of counsel), for plaintiff.

James W. Moorman, Cadwalader, Wickersham & Taft, New York City, David J. Mahoney, Mark L. Manewitz, Exxon Corp., Linden, N.J., for defendants Exxon Corp. and Exxon Research and Engineering Co.

Norman Sade, Dennis M. Resnick, Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, New York City, for defendant Ingersoll-Rand Co.

Arthur P. Schmauder, New York City, David P. Schneider, BASF Wyandotte Corp., Parsippany, N.J., for defendant BASF Wyandotte Corp.

Melvin Katz, Michael Phillips, Lester, Schwab, Katz & Dwyer, New York City, for defendant Chrysler Corp.

Alan H. McLean, Hughes, Hubbard & Reed, New York City, for defendant National Can Corp.

E. Dennis Sisk, Hunton & Williams, New York City, for defendants Public Service Elec. & Gas Co. and Dana Corp.

## OPINION

EDWARD WEINFELD, District Judge.

The City of New York brings this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA),[1] together with various pendent state claims, against major corporations which generated and transported hazardous wastes dumped at five landfills owned and operated by the City. All defendants move to dismiss the complaint under Fed.R.Civ.P. 12(b)(6); in addition, defendant Refinemet International, Inc. ("Refinemet") moves to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2).

---

1. Pub.L. No. 96–510, 94 Stat. 2767, *codified at* 42 U.S.C. §§ 9601–57 (1982).

The City's complaint alleges that, beginning in 1972, the predecessor corporation of defendant Refinemet International, Ag-MET Inc., ("Ag-MET"), along with other affiliated corporations in the business of rerefining oil, contracted with the remaining defendants ("the generator defendants") to transport and dispose of industrial and chemical waste generated by the latter defendants' activities in the metropolitan area. Ag-MET and the ten other transporting companies ("the Mahler companies") were owned or operated, in whole or in part, by one Russell Mahler. Mahler subsequently pled guilty in this district to an information charging that from 1972 to 1980 he conspired to bribe John Cassiliano, an employee of the City's Department of Sanitation, in order to gain access to five City landfill sites for the purpose of illegally disposing of industrial and chemical waste. Cassiliano was convicted after trial in New York State Supreme Court of the charge of official misconduct in allowing one or more of the Mahler companies to dispose of waste in City landfills in violation of law.

The complaint alleges that the Mahler companies illegally disposed of the generator defendants' industrial and chemical wastes, containing "hazardous substances" within the meaning of CERCLA, in such fashion that the City cannot presently determine at which landfill site the wastes of each of the generator defendants were deposited. The City further alleges that these wastes have contaminated groundwater at each of the landfills, and that this groundwater is leaching into surface waters surrounding each of the landfills, including Jamaica Bay, Eastchester Bay, and Richmond Creek, as well as threatening aquifers which are present or potential sources of drinking water for the City's residents. The City seeks in its federal causes of action recovery of those costs it has already incurred in an effort to re-move the hazardous wastes from the five landfills, declaratory relief holding defendants liable for the City's future costs of response, and damages for injury caused to natural resources under the City's management and control which are affected by the releases of toxic waste from the landfills.

The defendants move for dismissal of the City's causes of action under CERCLA pursuant to Fed.R.Civ.P. 12(b)(6), contending on various grounds that the City's allegations do not state a claim for private cost recovery under the statute. In addition, defendant Alcan Aluminum Corporation ("Alcan") moves to dismiss the City's complaint on the ground that the wastes generated by it and transported by the Mahler companies for disposal at the City's landfills do not contain a "hazardous substance." Discussion of these motions requires a preliminary review of the purpose and structure of the statute.

## CERCLA

 The Comprehensive Environmental Response, Compensation, and Liability Act, also known as CERCLA or Superfund, was enacted in the closing months of the 96th Congress as a legislative response to the growing problem of toxic industrial wastes, many of which, having been disposed of before their toxicity was widely known, had contaminated the land and water resources of American towns and cities. CERCLA was a legislative attempt to create a coherent response to the dual problem of emergency response to releases of toxic chemicals into the environment, and short- and long-term response to the presence of toxic wastes in existing dumpsites, many of which had been abandoned by any party who could be held legally or financially responsible for cleanup. The statute as it was finally enacted was the product of a long and tortuous process of legislative compromise,[2] and is far from being a model

---

**2.** The legislative history of CERCLA has recently been considered by the Supreme Court in *Exxon Corp. v. Hunt*, —— U.S. ——, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986); *see also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1039–1040 (2d Cir.

1985). Two different bills dealing with the toxic waste problem proceeded through the House and Senate; in the Senate there were extensive eleventh-hour alterations, including the deletion of provisions establishing liability for personal

of statutory or syntactic clarity. In broad outline, the Act establishes a trust fund, commonly called Superfund, which is financed predominantly through excise tax revenues. The federal government is authorized to use Superfund moneys to finance "governmental response" activities and to pay "claims" arising from the response activities of private parties conducted with the express prior approval of designated federal authorities or claims by federal or state governmental entities for damage caused to natural resources belonging to that government.[3] In addition to the Superfund claim structure, the Act provides that federal and state governments and private parties may sue those responsible for the generation, transportation, or disposal of hazardous wastes, who are strictly liable for the response costs incurred.[4] CERCLA defines "response" actions to be of two types: "removal" actions, and "remedial" actions. Removal actions are defined as

> the cleanup and removal of released hazardous substances from the environment, such actions as may be taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare....[5]

while remedial actions are defined as

> those actions consistent with permanent remedy taken instead of or in addition to

removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment....[6]

In short, "removal" actions are primarily those intended for the short-term abatement of toxic waste hazards, while "remedial" actions are typically those intended to restore long-term environmental quality.[7]

Response actions taken by the federal government and other parties are to be conducted within the guidelines established by the National Contingency Plan ("NCP") which, under § 105 of the Act, "shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants," including criteria for evaluating the appropriateness and effectiveness of response measures, along with methods for investigating and evaluating methods for the cleanup of hazardous substance dumpsites.[8] CERCLA defines "hazardous substances" as those which are identified in regulations propounded by the Environmental Protection Agency pursuant to § 102 of the Act, or any "element, compound, mixture, solution of substance" designated pursuant to the Federal Water Pollution Control Act, the Solid Waste Disposal Act, or the Toxic Substances Control Act, specifically excluding petroleum and many petroleum products.[9]

The City presents three CERCLA causes of action in this litigation, all founded on the cost recovery provision. In the first

---

3. *See* CERCLA § 111(a), 42 U.S.C. § 9611(a).

4. CERCLA § 107(a), 42 U.S.C. § 9607(a).

injury caused by the dumping of hazardous waste. The House bill, H.R. 7020, 96th Cong., 2d Sess. (1980), was largely conformed to the Senate bill, and, as amended, was the version enacted. As a result of this complex series of events, the Committee Reports and other legislative materials regarding CERCLA are dubious sources for interpretation of the statute, which in its final form reflected legislative judgments which differed substantially from those incorporated in the earlier House and Senate bills.

5. CERCLA § 101(23), 42 U.S.C. § 9601(23).

6. CERCLA § 101(24), 42 U.S.C. § 9601(24).

7. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir.1985).

8. CERCLA § 105, 42 U.S.C. § 9605. The present National Contingency Plan is codified at 40 C.F.R. §§ 300.1 *et seq.* (1985).

9. CERCLA § 101(14), 42 U.S.C. § 9601(14).

two causes of action, the City seeks to recover its present and future costs of response at the five landfill sites, first from the generator defendants and second from Refinemet International as a transporter of hazardous wastes; in its third cause of action, the City seeks to recover damages for injury to natural resources under its control. Defendants in urging dismissal of these causes of action, argue that the City has not met the pleading requirements imposed upon private litigants under the Act, but has instead erroneously sued under the standard governing cost recovery actions undertaken by the federal or state governments. In addition, defendants argue, the City has not yet incurred any response costs with the meaning of the Act, and accordingly they contend that the City's claims are premature.

## PRIVATE COST RECOVERY ACTIONS UNDER CERCLA

The City seeks to recover its costs of response under § 107(a) of the Act, 42 U.S.C. § 9607(a). Section 107 provides that repayment may be sought from specified classes of parties, including "person[s] who by contract ... arranged for disposal or arranged with a transporter for transport ... of hazardous substances" or "person[s] who accepted hazardous substances for transport," for:

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing

such injury, destruction, or loss resulting from such a release.

The City's first two causes of action are stated in the complaint to be predicated on § 107(a)(4)(B) of the Act, 42 U.S.C. § 9607(a)(4)(B).[10] The City alleges, however, that its present and future response costs are and will be "incurred in a manner not inconsistent with the 'national contingency plan'."[11] Because § 107(a)(4)(B) requires instead that recoverable response costs be *consistent with* the NCP, defendants contend that the City has improperly sued under the standard reserved in § 107(a)(4)(A) for "the United States or a State." Defendants argue that the City is not the United States or a State, and from the difference between the phrases *"not inconsistent with"* in § 107(a)(4)(A) and *"consistent with"* in § 107(a)(4)(B) they deduce two conclusions which they allege preclude the present lawsuit: first, that the City must seek preclearance of its response measures from the EPA or the New York State Department of Environmental Conservation; and second, that the City cannot seek contribution for its response costs unless and until the federal or state governments have themselves directly incurred some costs of response. The City on the other hand contends that it may maintain an action under the standards applicable to the federal and state governments, and further contends that it need not obtain advance clearance from the EPA or state authorities, or await any action on their parts.

 In resolving a motion to dismiss a complaint, this Court must be guided by the pleading.[12] The City's complaint alleges a cause of action under § 107(a)(4)(B),[13] and it is the sufficiency in law of this claim which the Court is called upon to determine, not whether the City might have maintained an action under § 107(a)(4)(A), suing under the standards applicable to the

10. Complaint, ¶ 42.

11. Complaint ¶ 44.

12. *Rapf v. Suffolk County*, 755 F.2d 282, 290 (2d Cir.1985); *Heit v. Weitzen*, 402 F.2d 909, 913 (2d Cir.1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969).

13. Complaint, ¶ 42.

state and federal governments. Accordingly, as defendants contend, the City must demonstrate that its present and future costs of response are "necessary," and are "consistent with the national contingency plan." But this is not a matter of pleading; it is a matter of proof. As other courts construing this provision have observed, consistency with the NCP is not a matter which can be resolved on a motion to dismiss; it is a question of fact to be determined at trial upon the merits.[14] If the phrases "consistent with" and "not inconsistent with" embody alternative legal standards, and are not, as first appears, the fruit of a semantic quibble, or a distinction without a difference, it is the former standard that the City must meet under § 107(a)(4)(B). Whether it succeeds or fails cannot be determined now, but must await the development of a factual record.

■ Defendants maintain that the City, as a private party suing under § 107(A)(4)(B), must obtain prior approval from the EPA or the New York State Department of Environmental Conservation as a precondition to the commencement of a cost recovery action. Although some courts have found such a requirement to be implied by the provision that response costs must be consistent with the NCP,[15] neither the statute nor the NCP itself supports such an interpretation. The Act provides that when private parties seek reimbursement from the Superfund for their "necessary costs of response," "such costs must be approved under the [NCP] and certified by the responsible Federal official."[16] By contrast, no such requirement appears in § 107(a), which governs actions in which reimbursement is sought, not from the Superfund, but directly from other parties whose activities have caused the need for response. "The fair inference is that Congress did not intend for CERCLA to impose such a requirement."[17] Nor does the national contingency plan provide support for a preclearance requirement. The regulations do not explicitly require EPA approval before response measures may be undertaken, and, in that section of the NCP which addresses "non-government participation," it is stated that:

> If any person other than the Federal government or a State ... takes response action and intends to seek reimbursement from the Fund, such actions to be in conformity with this Plan for purposes of section 111(a)(2) of CERCLA may only be undertaken if such person notifies the Administrator of the EPA ... prior to taking such action and receives prior approval to take such action.[18]

By specifically imposing a requirement of prior approval only when reimbursement will be sought from the Superfund, the NCP observes the same distinction found in the Act, and further justifies the inference that parties not seeking such reimbursement from the federal fund need not seek prior federal concurrence.[19]

■ The distinction between those seeking reimbursement from the Superfund and those seeking only private cost recovery is in keeping with the fundamental remedial purposes of the statute. The management of a trust fund containing limited resources establishes a strong governmental interest in assuring that those drawing upon such resources are acting in a consistent fashion, and that the funds available are applied to the areas of greatest need. The private recovery provisions

**14.** *Dedham Water Co. v. Cumberland Farms Dairy,* 588 F.Supp. 515, 517–18 (D.Mass.1983); *City of Philadelphia v. Stepan Chem. Co.,* 544 F.Supp. 1135, 1144 & n. 16 (E.D.Pa.1982).

**15.** *See Wickland Oil Terminals v. ASARCO, Inc.,* 590 F.Supp. 72 (N.D.Cal.1984); *Cadillac Fairview/California, Inc. v. Dow Chem. Co.,* 21 Env't Rep. Cas. (BNA) 1584 (C.D.Cal.1984); *Bulk Distrib. Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437 (S.D.Fla.1984).

**16.** CERCLA § 111(a)(2), 42 U.S.C. § 9611(a)(2).

**17.** *Artesian Water Co. v. New Castle County,* 605 F.Supp. 1348, 1357 (D.Del.1985).

**18.** 40 C.F.R. § 300.25(d) (1985).

**19.** *See Pinole Point Properties v. Bethlehem Steel Co.,* 596 F.Supp. 283, 290 (N.D.Cal.1984).

of the statute, however, serve a different purpose; they assure an incentive for private parties, including those who may themselves be subject to liability under the statute, to take a leading role in cleaning up hazardous waste facilities as rapidly and completely as possible. To require private parties to await governmental approval would be to restrict the overall national effort to the volume of activity which the federal government could centrally supervise, and this would defeat the Act's basic intent.

Further support for this conclusion may be found in the decision of our Court of Appeals in *New York v. Shore Realty Corp.*,[20] in which, in the related area of cost recovery actions by the State pursuant to § 107(a)(4)(A), the Court rejected a claim that the State could not maintain an action without prior EPA approval, holding that the "requirement of consistency with the NCP [means] that states cannot recover costs inconsistent with the response methods outlined in the NCP."[21] While prior approval of response measures by the agency responsible for the promulgation of the regulations is strong evidence of the required consistency, it is not the only fashion in which such consistency could be demonstrated.

Defendants further contend that the City may not recover its own response costs unless and until either the state or federal authorities have themselves incurred response costs at the site. Defendants base this argument upon the language of § 107(a)(4)(B), which provides that private parties may recover "any other necessary costs of response incurred by any other person consistent with the national contingency plan," which immediately follows the provision in § 107(a)(4)(A) establishing liability for "all costs of removal or remedial action incurred by the United States Government or a State." The se-

quence implies, according to defendants, that "other" costs may only arise after the governmental removal or remedial actions have occurred.

This argument has neither a strong foundation in reason nor one in policy. As one court confronted by the contention has stated, "it is much more reasonable to infer that Congress used the word 'other' simply to differentiate between government response costs and private response costs rather than as an oblique but substantial qualification to the broad language of Section 107(a)(4)(B) authorizing suits by private parties."[22] A contrary holding would serve to limit the number of cleanup operations which could be conducted under the statute to those for which the federal or state governments were willing and able to provide funding. This is again in conflict with the statutory purpose of encouraging private parties as well as governmental agencies to involve themselves in the speedy abatement of threats posed by toxic wastes. Accordingly, the Court holds that the City need not secure prior approval from federal or state authorities, or await the expenditure of moneys by those authorities at the affected sites, as a precondition for the commencement of this action.

The defendants also argue that the City's action for cost recovery is not ripe because the City has yet to incur any response costs at the sites within the meaning of the Act. The Act defines "response" costs to include the costs of both "removal" and "remedial" actions, and, as noted previously, "removal" actions are specifically defined to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances."[23] The complaint, whose factual allegations are of course necessarily accepted as true for the

**20.** 759 F.2d 1032 (2d Cir.1985).

**21.** *Id.* at 1047–48 (citing with approval *Pinole Point Properties v. Bethlehem Steel Co.,* 596 F.Supp. 283, 289–90 (N.D.Cal.1984)).

**22.** *Artesian Water Co. v. New Castle County,* 605 F.Supp. 1348, 1357 n. 11 (D.Del.1985).

**23.** CERCLA § 101(23), 42 U.S.C. § 9601(23).

purposes of a motion to dismiss,[24] alleges that:

> The response costs incurred by the City to date total over one million dollars, and include, but are not limited to, the cost of collecting and analyzing groundwater samples at all five landfills; hydrogeological studies and air quality monitoring at the Fountain Avenue, Pennsylvania Avenue, Edgemere and Brookfield landfills; [and] a waste oil remediation study at the Pennsylvania Avenue site.[25]

These costs, which clearly fall within the definition of removal costs quoted above, are sufficient to establish, for the purposes of the present motion, that the City has incurred response costs at the affected sites.[26] Accordingly defendants' motion to dismiss the City's first and second causes of action under CERCLA is denied.

### DAMAGE TO NATURAL RESOURCES

■ In its third cause of action under CERCLA, the City seeks to recover damage to natural resources under its management or control allegedly suffered as a result of the dumping of hazardous wastes at the five landfill sites concerned. Defendants contend that the City may not maintain an action for damage to natural resources under CERCLA. Section 107(a)(4)(C) of the Act provides that generators and transporters of hazardous wastes, inter alia, are liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."[27] The Act defines natural resources as:

land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States ... any State or local government, or any foreign government.[28]

Under this definition, the waters of Jamaica Bay, Eastchester Bay, and Richmond Creek, along with the underground aquifers lying beneath the affected landfills, which are under the control or management of the City, are natural resources within the meaning of the statute, and damage to them may be compensated by an action under CERCLA.

■ The defendants argue, however, that the City is not the proper plaintiff to bring such an action. Defendants rely in support of this proposition on § 107(f) of the Act, which states:

> In case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) of this section liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State.... The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages. Sums recovered shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government or the State government, but the measure of such damages shall not be limited

---

**24.** *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Rapf v. Suffolk County,* 755 F.2d 282, 290 (2d Cir.1985).

**25.** Complaint, ¶ 43.

**26.** *Cf. New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042–43 (2d Cir.1985) ("costs in assessing the conditions of the site ... squarely fall within CERCLA's definition of response costs"). Defendants argue that other response measures taken by the city, including the construction of an oil boom and retaining sheet at one landfill, see Complaint, ¶ 43, are not recoverable, be-

cause they are costs the City is required to assume under section 311 of the Clean Water Act, 33 U.S.C. § 1321. Which particular costs are recoverable under CERCLA is a factual issue to be determined at trial; in view of the disposition reached by the Court as to the City's other alleged response costs, it is not necessary to address defendants' argument at this time.

**27.** CERCLA, § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C).

**28.** CERCLA, § 101(16), 42 U.S.C. § 9601(16).

by the sums which can be used to restore or replace such resources.

Because the Act specifies that liability is "to the United States or any *State*," defendants contend, they cannot be liable to the City in an action pursuant to § 107(a)(4)(C).

Defendants' argument depends upon an overly literal reading of § 107(f); to adopt their approach would be to disregard Judge Learned Hand's sage advice "not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." [29] Since the statute specifically includes within its ambit "natural resources" which are under the control of local governments, the Act's broad remedial intention [30] is not furthered by a reading which requires the State, which is not the government charged with managing and conserving those resources, to bring suit to recover for damage done to them. The clear purpose of the Act, which is to ensure prompt and effective cleanup of hazardous wastes and the restoration of environmental quality, is not advanced by preventing the authorities entrusted with the management of public resources from bringing actions to recover the cost of protecting them.

Defendants' reading of § 107(f) must also be rejected because it does not take adequate account of the totality of the paragraph at issue. The Act provides that the authorized representative of the state may maintain an action on the state's behalf, but does not define "authorized representative." It is not a settled question whether the source of such authorization is to be found under state law,[31] but the ultimate determination is factual in character, and must await at least the presentation of a more complete record. The City's complaint pleads a sufficient claim under § 107(a)(4)(C), and no more is required at this time. Defendants' motion to dismiss the City's third CERCLA cause of action is denied.

## ALCAN'S MOTION TO DISMISS

Defendant Alcan Aluminum Corporation ("Alcan") moves separately to dismiss the complaint on the ground that its wastes, for which it arranged transportation with the Mahler companies, did not include hazardous substances within the meaning of CERCLA. The City opposes the motion on the ground that Alcan's wastes did in fact contain hazardous substances within the statutory definition. As noted previously, *supra* at 614–15, CERCLA defines hazardous substances as those which are identified in regulations issued by the EPA pursuant to § 102(a) of the Act, or which are so defined under other federal environmental protection statutes, particularly the Clean Water Act. Under § 102, the EPA may also determine "the quantity of any hazardous substance the release of which shall be reported" pursuant to § 103. If the EPA does not designate such a reportable quantity for any particular hazardous substance, CERCLA fixes the quantity at one pound.

Alcan alleges that the material transported by the Mahler companies and eventually deposited in the affected landfills was waste oil from its process for rolling aluminum ingots. This oil, which contained varying amounts of water, also contained unspecified and unidentified amounts of lead or lead compounds. The City alleges that this waste oil also contained cadmium and chromium, or compounds thereof, which are defined as hazardous substances by EPA regulations.[32] Alcan denies that these latter constituents were present except in trace quantities so low as to be

---

**29.** *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

**30.** *Cf. United States v. Reilly Tar & Chem. Corp.,* 546 F.Supp. 1100, 1112 (D.Minn.1982).

**31.** *See Town of Boonton v. Drew Chem. Co.,* 621 F.Supp. 663, 667 (D.N.J.1985) (municipality may maintain action for damage to natural resources under § 107(a)(4)(C)).

**32.** *See* 40 C.F.R. § 302.4 (1985).

unmeasurable or insignificant, and states that its analysis, while unable to specify precisely what lead compound is present in its waste oil, definitively establishes that it is not elemental lead or any lead compound listed as hazardous by the EPA.

■■■■ The parties have submitted numerous lengthy affidavits in support of their respective positions, but a mere recitation of the nature of the dispute indicates why it cannot be resolved at this stage of the litigation. Alcan moves pursuant to Fed.R.Civ.P. 12(b)(6), but the ground for the motion is its claim that factual matters discussed in its affidavits are undisputed, and permit dismissal as a matter of law. The Court declines to convert Alcan's motion into one for summary judgment; the issue of the precise chemical nature of the wastes deposited in the City's landfills is one to be addressed after discovery. For the purposes of its complaint, the City has alleged a sufficient basis for its claim, which is that Alcan generated and contracted for the transport of industrial waste containing substances which are defined as hazardous substances under the Act. In order for Alcan to be liable, the City must prove that the wastes did in fact contain such hazardous substances, and that the presence of those hazardous substances in the City's landfills caused or will cause the City to incur response costs within the meaning of the Act. The basic factual question of the precise constituents of Alcan's wastes is hotly disputed; on the present record, it could not be resolved upon summary judgment, much less upon a motion to dismiss. Accordingly, Alcan's motion to dismiss the complaint is denied.[33]

## REFINEMET'S MOTION TO DISMISS

Defendant Refinemet, the parent of the now-defunct companies which conducted the illegal dumping in the city's landfills, moves to dismiss the City's complaint as against it for lack of personal jurisdiction. Refinemet is a Delaware corporation with its principal place of business in Rhode Island. Although it alleges in the unsworn memorandum of its counsel that there is no basis for exercise of jurisdiction under New York's long-arm statute, it fails to contravene the allegations contained in the affidavit of Russell Mahler, brought forward by the city, which show Refinemet's predecessor, Ag-MET, Inc.,[34] owned and operated Newtown Refining, Russell Mahler's company, as a "mere department" of Ag-MET under the standards established by our Court of Appeals in *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*[35] *Beech Aircraft* sets out four factors to consider in deciding whether the activities of a subsidiary should be imputed to a parent for the purpose of establishing jurisdiction: First, there must be common ownership. This test is satisfied where the two enterprises are arranged in a classic parent-subsidiary relationship, and is not in dispute here.[36] The remaining factors to be considered are: financial dependency of the subsidiary on the parent; interference by the parent in the selection and assignment of the subsidiary's personnel and failure to observe corporate formalities; and the degree of control exercised over the marketing and operational policies of the subsidiary.

The affidavit of Russell Mahler sets forth facts concerning the operation of Newtown Refining which are uncontroverted by defendant Refinemet in its papers.

---

**33.** Alcan also moves to dismiss the City's pendent state law claims, and seeks Rule 11 sanctions against the City's counsel for bringing this action, which it contends the City's counsel knew was without a factual basis. In light of the Court's disposition of the motion to dismiss the CERCLA claims, these motions are necessarily denied.

**34.** Ag-MET has recently changed its name to Refinemet. In all other respects the two corporations are apparently identical.

**35.** 751 F.2d 117 (2d Cir.1984).

**36.** In 1976, Ag-MET, Inc., Refinemet's corporate predecessor, purchased the stock and assets of the Mahler companies, which had been doing business under various names since 1958, and which had engaged in the illegal disposal of toxic wastes since 1972. The assets of the Mahler companies were received by a wholly-owned subsidiary of Ag-MET called Ag-MET Oil Services, which later changed its name to Newtown Refining. Affidavit of Russell Mahler, ¶¶ 3–4.

According to Mahler's affidavit, Ag-MET paid his salary as president of Newtown Refining, whose Board also included the president and the treasurer of Ag-MET. The Board of Directors of Newtown Refining never met; all matters being handled at the meetings of Ag-MET's Board. Ag-MET controlled all purchases by Newtown Refining "more expensive than ... office supplies," and arranged financing for the purchase of trucks; Ag-MET guaranteed payment of the resulting loans. In addition, Newtown Refining operated at a loss during some of the period of Refinemet's ownership; during the latter half of 1977 and all of 1978 Ag-MET made cash contributions "totalling approximately $1–3 million" to Newtown Refining's operations. Ag-MET interviewed, hired and assigned the controller of Newtown Refining.[37]

These facts establish that the second and third factors under *Beech Aircraft*, financial dependency and failure to observe corporate formalities, weigh entirely in plaintiff's favor. Not only did Ag-MET guarantee loans made to Newtown Refining by third parties, it also provided substantial amounts of cash directly to the subsidiary. The disregard of corporate formalities is also clear. The payment of the subsidiary's president by the parent, the absence of any meetings of the subsidiary's Board of Directors, and the appointment by the parent of executives of the subsidiary all show the absence of compliance with corporate formalities and the interference of the parent in the subsidiary's operations.

The last factor to be considered under *Beech Aircraft* is the parent's degree of control over the marketing and operations of the subsidiary. Defendant Refinemet's position is that it neither knew about nor approved Mahler's illegal dumping activities, and exercised no substantial control over Newtown Refining's operations. Mahler contends that Refinemet's auditors and Board of Directors knew about the illegal dumping operations, and deliberately ignored them. Whatever may be true about Ag-MET's specific knowledge of Newtown Refining's illegal activities, Mahler's affidavit shows that in other areas Ag-MET exerted substantial control. Thus, in the fall of 1977 and again in the spring of 1978, Newtown Refining relocated its business under the direction of Ag-MET; both moves were to facilities owned by Ag-MET.[38]

 Since discovery has not yet occurred, plaintiff need only make a prima facie showing of jurisdiction; if jurisdiction is still disputed after completion of discovery, plaintiff must demonstrate it by a preponderance of the evidence upon the trial.[39] Upon the record as it stands, including those matters sworn to by Russell Mahler, and uncontroverted in Refinemet's papers, the Court finds that the City has made its prima facie showing. The motion to dismiss for lack of personal jurisdiction is denied.

So ordered.

---

**37.** *See* Affidavit of Russell Mahler, ¶¶ 5–7.

**38.** Affidavit of Russell Mahler, ¶¶18–19, 26–30.

**39.** *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984); *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *Teachers Ins. & Annuity Assoc. v. Butler,* 592 F.Supp. 1097, 1099 (S.D.N.Y.1984); *Morse Typewriter Co. v. Samanda Office Comm. Ltd.,* 629 F.Supp. 1150, 1151–52 (S.D.N.Y.1986).