**TOWN OF BEDFORD, Plaintiff,**

v.

**RAYTHEON COMPANY, Massachusetts Port Authority, United States Department of the Air Force and United States Department of the Navy, Defendants.**

**Civ. A. No. 89–2313–WD.**

United States District Court,
D. Massachusetts.

Jan. 15, 1991.

Robert M. Hacking, Calum B. Anderson, Parker, Coulter, Daley & White, Boston, Mass., Christopher L. Rissetto, Gary B. Cohen, Washington, D.C., for plaintiff.

William A. Zucker, Gadsby & Hannah, Boston, Mass., for Raytheon Co.

Peter S. Terris, William L. Lahey, Kathleen E. McGrath, Palmer & Dodge, Boston, Mass., for Mass. Port Authority.

George Henderson, Asst. U.S. Atty., for U.S. Dept. of the Air Force and U.S. Dept. of Navy.

## MEMORANDUM

WOODLOCK, District Judge.

The defendants in this action, Raytheon Company, Massachusetts Port Authority, the U.S. Department of the Air Force, and the U.S. Department of the Navy, bring motions to dismiss Count II of plaintiff Town of Bedford's complaint which seeks recovery for natural resource damages under provisions of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(4)(C), (f)(1). The aquifer, which was formerly Bedford's principal drinking water source, is alleged now to be polluted by hazardous substances and unfit for human consumption. Bedford complains that each of the defendants engaged in activities that either used or generated hazardous substances which contaminated sites owned and/or operated by the defendants and leached into the aquifer eliminating the town's supply of potable water.

In support of the motions to dismiss now before me, the principal argument the defendants present is that Bedford, as a municipality, is not authorized to bring suit for natural resource damages.[1]

In response, Bedford not only opposes the motion but seeks by its own motion for partial summary judgment an affirmative declaration that, although a municipality, it is entitled to the less demanding burden of proof applicable to a state in a CERCLA cost recovery action.

## I.

CERCLA provides several avenues to obtain monetary recovery for specifically identifiable losses incurred in connection with the release of hazardous substances:

(a) Under 42 U.S.C. § 9607(a)(4)(A), "the United States Government or *a State* or an Indian tribe" may recover "all costs of removal or remedial action ... *not inconsistent* with the national contingency plan" (emphasis supplied) establishing procedures and standards for such response actions;

(b) Under 42 U.S.C. § 9607(a)(4)(B), "any *other person*" may recover "any other necessary costs of response ... *consistent* with the national contingency plan" (emphasis supplied); and

(c) Under 42 U.S.C. § 9607(a)(4)(C), "damages for injury to, destruction of, or loss of natural resources" may be recovered; however, liability for natural resource damages "shall be to the United States Government and to any State" and "[t]he President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover such damages," 42 U.S.C. § 9607(f)(1).

Thus—as between the United States Government and any State on the one hand, and any other person on the other—CERCLA provides differential access to remedies and differential burdens in establishing access to those remedies.

Bedford argues that the court should interpret the term "state" broadly to include political subdivisions of states. If Bedford, as a municipal subdivision of the Commonwealth of Massachusetts, were included within the definition of "state," it would (i) be authorized to maintain an action for natural resource damages under § 9607(a)(4)(C), and (ii) be the beneficiary of § 9607(a)(4)(A), which imposes on the defendants the burden of proving response costs were inconsistent with the National Contingency Plan ("NCP").[2]

The answer to Bedford's contentions begins with the relevant statutory definition. CERCLA defines "state" in the following way:

> The terms "United States" and "State" include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction.

42 U.S.C. § 9601(27). The plain language of CERCLA's definition of "state" does not encompass political subdivisions such as municipalities. "[T]he entities that are [explicitly] included—states, the District of Columbia, Puerto Rico ... United States

---

**1.** The defendants also contend the natural resources claim in Count II must be dismissed because Bedford did not provide sixty days' notice before bringing suit, as required by 42 U.S.C. § 9613(g)(1). Raytheon separately argues that the statute of limitations bars Bedford's natural resource damages action. Because I will grant defendants' motion on their principal grounds, I do not reach these secondary bases for the motion. Similarly, because I am allowing the defendants' motion for summary judgment on grounds that Bedford is not authorized to maintain a natural resource damages action, I will deny Bedford's motion for leave to amend its complaint to address the notice issues raised by defendants.

**2.** The NCP is the body of regulations mandated by CERCLA and promulgated by the United States Environmental Protection Agency to "establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants," including criteria for evaluating the appropriateness and effectiveness of response measures in general, as well as remedial action required by a threat to the public health. 42 U.S.C. § 9605; *see also* 40 C.F.R. § 300.1 *et seq.*

territories and possessions—differ so vastly from villages, towns, boroughs, townships, counties, and cities as to be words of exclusion." *City of Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1484, 1488 (E.D.Pa.1989). All the entities explicitly included in subsection (27) are sovereigns, and unlike municipalities, they do not depend on states to grant them power.[3] By contrast, a "municipality" or other "political subdivision of a State" is explicitly included in the definition of "person" under § 9601(21), drawing such entities into the ambit of the "other person" whose entitlement to response costs, unlike that of "the United States Government, or a State or an Indian tribe" under § 9607(a)(4)(A), is determined by the more demanding burdens of § 9607(a)(4)(B).

In ordinary circumstances, the plain language of the statute would end the discussion of Bedford's contentions and dispose of its position that it is entitled to the statutory perquisites provided in CERCLA to a "State." There is, however, case law—antedating the 1986 amendments to CERCLA—which supports Bedford's position. That case law requires some analysis.

## II.

Bedford relies on *Mayor and Bd. of Aldermen v. Drew Chemical Corp.*, 621 F.Supp. 663 (D.N.J.1985), and *City of New York v. Exxon Corp.*, 633 F.Supp. 609 (S.D. N.Y.1986), each of which held that a municipality was a "State" for purposes of bringing a natural resource damages action. Both courts found policy reasons for a broad reading of the word "state" to assimilate municipalities within it. The *Drew Chemical* court looked to the remedial purpose of CERCLA and concluded:

> It would be anomalous for this far reaching remedial statute to give states a cause of action for damages to natural resources owned by the State but for it to exclude cities from access to such a cause of action while expressly including resources owned by "local governments" within the scope of the protected subject of § 9607(a)(4)(C).

621 F.Supp. at 666. *Drew Chemical* thus determined "to expand the illustrative list introduced by the word 'includes' to encompass" municipalities. *Id.* at 667.[4]

---

**3.** Perhaps the most firmly settled principle of municipal law in the United States is Dillon's Rule which provides that local governmental power is derived entirely from the state and is legitimately exercised only in relation to activities authorized by enabling legislation enacted by the state legislature. *See generally,* Frug, *The City as A Legal Concept,* 93 Harv.L.Rev. 1057, 1109–15 (1980). Massachusetts is no exception to the rule, although it has enacted a broad home rule amendment to its constitution. Mass. Const. amend. art. LXXXIX.

**4.** The *Drew Chemical* court sought to avoid the apparent plain meaning of CERCLA's definition of "State" by noting:

> A term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what a term 'means.' It has been said 'the word includes is usually a term of enlargement, and not of limitation.... It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated....'

*Mayor and Bd. of Aldermen v. Drew Chemical Corp.,* 621 F.Supp. at 666 (quoting 2A N. Singer, Statutes and Statutory Construction § 47.07 (4th ed. 1984) (citations omitted)).

Bedford, in addition, points to other statutes which define "state" using the more limited term "means." *See, e.g.,* Resource Conservation and Recovery Act, 42 U.S.C. § 6903(31); Clean Water Act, 33 U.S.C. § 1362(3). And in the Safe Drinking Water Act, Congress utilized even more restrictive language: "The term 'State' includes, in addition to the several States, *only* the District of Columbia, Guam, ..." 42 U.S.C. § 300f(13) (emphasis added). Bedford argues that the decision to use "include" in CERCLA, instead of limiting terms such as "means" and "only," reflects Congressional intent to have "State" construed broadly.

But, as Judge Ditter observed in *Stepan Chemical,* the way in which Congress has chosen to define "State" in other statutes "is of no moment" because it did not use those drafting devices in CERCLA.

> Moreover, in other sections of CERCLA, Congress clearly refers to "municipalities," "local governments," and "political subdivisions," *see, e.g.,* 42 U.S.C. § 9601(21) ("person" defined to mean, among other things, a municipality and political subdivision of a state); 42 U.S.C. § 9605(4) (referring to the "Federal, State, and local governments"), thereby suggesting both that the omission of municipalities from the definition of "state" was not accidental and that Congress had no intention of implicitly including municipalities within the word "state".

713 F.Supp. at 1489.

The *Exxon* court reached a similar conclusion:

> Since the statute specifically includes within its ambit "natural resources" which are under the control of local governments, the Act's broad remedial intention is not furthered by a reading which requires the State, which is not the government charged with managing and conserving those resources, to bring suit to recover for damages done to them. The clear purpose of the Act, which is to ensure prompt and effective cleanup of hazardous wastes and the restoration of environmental quality, is not advanced by preventing the authorities entrusted with the management of public resources from bringing actions to recover the cost of protecting them.

633 F.Supp. at 619 (footnote omitted); *see also, City of New York v. Exxon Corp.,* 112 B.R. 540, 545 (S.D.N.Y.1990) (later proceeding reconfirming holding that municipality "does have standing as a governmental plaintiff under Sections 107(a)(4)(A) and (C) of CERCLA").

To be sure, CERCLA is a "far reaching remedial statute," *Drew Chemical,* 621 F.Supp. at 666, whose "clear purpose ... is to ensure prompt and effective cleanup of hazardous wastes and the restoration of environmental quality," *Exxon,* 633 F.Supp. at 619. But that purpose must be achieved within the framework of legislation designed to secure other goals as well. The statute evidences, as Judge Ditter observed in *Stepan Chemical,* "a concern on the part of Congress that unwise and excessive cleanup activity be restrained." 713 F.Supp. at 1488 n. 12. To effect this, the statute distinguishes between costs associated with response actions undertaken by the "United States Government or a State," which may be avoided by defendants only if the defendants can show they are not consistent with the NCP, 42 U.S.C. § 9607(a)(4)(A), and those response action costs incurred by "any other person" as to which that "other person" must bear the burden of showing consistency with the NCP before recovery is allowed. 42 U.S.C. § 9607(a)(4)(B).

The structure of the statute, in short, demonstrates a differential willingness to indulge a presumption that response action costs are recoverable. For those actions undertaken by entities cloaked with sovereignty, the burden is shifted to the defendants to avoid assessment; for those actions undertaken by entities without the attributes of sovereignty, the burden remains upon them to establish entitlement. Moreover, it is only those entities with the requisite degree of sovereignty which may recover natural resource damages at all.

This structural differentiation between entities with the qualities of full sovereigns and "other persons" was clarified by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), which created a mechanism for states to appoint natural resource trustees to bring lawsuits seeking natural resource damages. Prior to SARA, a policy-driven, expansive interpretation of the word "State," designed to include local governments, was the only way a municipality could bring a natural resource damages action under CERCLA. In SARA, Congress provided an express means for states to bring natural resource damage actions by permitting the states to designate "natural resource trustees." 42 U.S.C. § 9607(f). Section 9607(f)(2)(B) provides that "[t]he Governor of each State shall designate State Officials who may act on behalf of the public as trustees for natural resources under this Act ... and shall notify the President of such designations." Thus, presumably, municipalities may now, under appropriate circumstances, seek designation of a municipal representative to pursue natural resource damages claims on behalf of or as a "natural resource trustee." SARA thereby undermined the driving assumption in *Drew Chemical* and *Exxon:* that a broad interpretation of "State" was necessary to permit municipalities to present such claims.

The amended legislation regularizes the procedure by which states may identify those with responsibility to protect their

natural resources directly through natural resource damages claims. Nothing in the structure of the statutory provisions establishing an appointment procedure for natural resource trustees suggests that municipalities are entitled to such an appointment merely because of their municipal status or their relationship to the natural resource.[5]

The decision to centralize in the Governor responsibility for designating state natural resource trustees is consistent with a more general concern, even apart from CERCLA, that the claims of municipalities relating to natural resources, which are typically of regional concern, not be subject to the parochial views of a state's political subdivision. In Massachusetts this is a concern of constitutional dimension. The Massachusetts Constitution reserves control over the disposition of natural resources to the state legislature. Thus, art. 97 of the Articles of Amendment to the Massachusetts Constitution requires that lands acquired by a municipality for purposes of water may not be used for other purposes except by two-thirds vote of each branch of the state legislature. *See generally Opinions of the Justices*, 383 Mass. 895, 917–18, 424 N.E.2d 1092 (1981). *Cf. Werlein v. United States*, 746 F.Supp. 887, 910 (D.Minn.1990) (fact that state law dictates that aquifer is held in trust by the state, along with language of § 9607(f)(1), precludes recovery by municipality for natural resource damages).

Concerns with developing a consistent approach, compatible with CERCLA's broad objectives, are magnified in this context because the concept of natural resource damages is a developing one without a fully determined content. *See generally In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pol-*

*lution*, 716 F.Supp. 676 (D.Mass.1989); Habicht, *Expanding Role of Natural Resource Damage Claims Under Superfund*, 7 Va.J.Natural Resources L. 1, 6, 20 (1987) (identifying potential conflict between federal and state authorities as an unsettled issue complicating litigation and settlement); *D.C.Cir. Review: Environmental Law*, 58 G.W.L.Rev. 932, 938 (1990) (discussing *Ohio v. United States Dept. of Interior*, 880 F.2d 432 (D.C.Cir.1989), which struck key provisions of Dept. of Interior's regulations promulgated under CERCLA, and noting "a great deal of uncertainty remains with respect to the proper method of assessing natural resource damage under CERCLA"); Cross, *Natural Resources Damage Valuation*, 42 Vand.L. Rev. 269 (1989) (discussing a wide range of competing methods of valuing natural resource damages); Note, *Defining the Appropriate Scope of Superfund Natural Resource Damage Claims: How Great an Expansion of Liability?*, 5 Va.J. Natural Resources L. 197, 224 (1985) (noting numerous difficulties inherent in bringing natural resource damages actions, including uncertainties establishing fair and efficient assessment methodologies).

The Congressional determination to require the Chief Executive of the sovereign to designate the trustee to pursue such a claim represents an understandable preference that litigation strategy and settlement decisions be centralized in this developing area to avoid a proliferation of inconsistent approaches by a range of different plaintiffs with counsel of variable quality and experience.[6]

### III.

Finally, Bedford contends that the legislative history of the SARA amendments

---

5. Indeed, Bedford has apparently not even sought assistance from the Secretary of Environmental Affairs, the only state official designated to date by the Governor of Massachusetts to act as a natural resource trustee, Letter from Governor Michael S. Dukakis to the President (May 17, 1989) (designating John P. DeVillars, Secretary of Environmental Affairs to the Commonwealth of Massachusetts, as the Commonwealth's trustee for natural resources for purposes of CERCLA).

6. I emphasize that this is a general policy consideration and should not be taken to suggest that the representation by counsel for Bedford here has been anything other than of the highest quality, apparently reflecting substantial experience in environmental litigation. But, the quality of counsel for the municipality in *this* case cannot overcome the larger policy goal, instinct in the structure of the statute, to centralize the conduct of natural resource damages litigation generally.

supports its contentions. I find these materials to be an unreliable guide to legislative intent. *See generally Dedham Water Co. v. Cumberland Farms Dairy*, 805 F.2d 1074, 1080 (1st Cir.1986) (quoting *United States v. Mottolo*, 605 F.Supp. 898, 902 (D.N.H.1985) ("CERCLA has acquired a well-deserved notoriety for ... an indefinite, if not contradictory, legislative history.")). The House of Representatives version of SARA, H.R. 2817, amended the existing definition of "State" specifically to exclude "a municipality or other political subdivision of a State." H.R. 2817, 99th Cong., 1st Sess. (1985). The Senate version reflected no change in the definition, and the SARA conference committee rejected the House's more restrictive definition of "State," and explicitly deferred "to the court's interpretation of this provision." H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. (1986) at 185, *reprinted in* 1986 U.S. Code Cong. & Admin.News 2835, 3278.

Some in Congress were aware of the *Drew Chemical* and *Exxon* decisions. Thus, Senator Lautenberg of New Jersey (where *Drew Chemical* arose) announced that SARA retained provisions upholding *Drew Chemical*, thus "allowing municipalities to sue for cost recovery under the same Superfund provisions available to States,[ ] to serve as trustees for natural resource damages.... [and] to move ahead with cleanup plans on their own." 132 Cong.Rec. S14912 (Oct. 3, 1986). Judge Ditter, however, concluded in *Stepan Chemical* that the legislative history of the SARA amendments was inconclusive indicating neither

an endorsement, or for that matter, a rejection by Congress of the *Drew Chemical* decision. While Congress, in the wake of *Drew Chemical*, indeed, could have explicitly amended the definition of "state" to exclude municipalities, it could have as easily amended the definition to include such units of local government. Instead, it chose to do nothing, leaving to the courts the interpretation of the term.

713 F.Supp. at 1489 n. 15.

Furthermore, House members criticized certain Senators for larding SARA's legislative history with their own special views. Rep. Snyder observed, for example:

Many of the issues ... were raised in conference and rejected by the conferees. Obviously, some staff members who were unable to persuade a majority of the conferees to accept particular statutory language have succeeded in having inserted in the legislative history statements favorable to their position, in the hope that a court will be persuaded to construe the statutory language in light of these statements.

Statement of Rep. Snyder, 132 Cong.Rec. H9573 (Oct. 8, 1986). Judge Ditter chose to disregard the insidious quality of this aspect of the "legislative history." I am of the view that the SARA legislative history on this point is worse than inconclusive, it is a solicitation to disregard what Congress actually did with the statute itself.

As Congressman Snyder observed, extra-statutory materials are easily manipulated to give the illusion of Congressional approval to cases whose principles cannot command a legislative majority. The problem is one Justice Scalia has addressed with some frequency of late. As a basic principle "Congress conveys its directions in the Statutes at Large, not in excerpts from the Congressional Record ..." *Begier v. I.R.S.*, — U.S. —, 110 S.Ct. 2258, 2268, 110 L.Ed.2d 46 (1990) (Scalia, J., concurring). "Congress is elected to enact statutes rather than point to cases, and its members have better uses for their time than poring over District Court opinions." *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 946–47, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring). Yet,

[a]s anyone familiar with modern-day drafting of congressional committee reports is well aware, the references to the cases [are] inserted, at best by a committee staff member on his or her own initiative, and at worst by a committee staff member at the suggestion of a lawyer-lobbyist; and the purpose of those references [is] not primarily to inform the Members of Congress what the bill

mean[s] ... but rather to influence judicial construction.

*Id.* 109 S.Ct. at 947.

Courts must be sensitive to the most basic principle of statutory construction that "unenacted approvals, beliefs, and desires are not laws," *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988). In particular, courts run the risk of "ignor[ing] rudimentary principles of political science [when they] draw any conclusions regarding [legislative] intent from the *failure* to enact legislation," *Johnson v. Transportation Agency of Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 1473, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting).

The legislative history of CERCLA, cobbled together to suggest that Congress meant something that it didn't say, is entirely unsatisfactory as a tool for statutory construction here. It provides no reliable foundation upon which to construct an understanding of the legislative intent regarding the definition of the term "State" in CERCLA.

## IV.

The First Circuit has recently observed that in construing CERCLA, "the primary focus of attention must be the statute itself," *Reardon v. United States*, 922 F.2d 28, 33 (1st Cir.1990). The language and structure of CERCLA make clear that a municipality is not a "State" as defined in the statute. Although references to the overall philosophy of CERCLA and its "legislative history" can be tailored to suggest that a different definition would be appropriate, such tailoring is not the proper way to approach construction of the statute. In light of the conclusion that the words and structure of the statute make evident a congressional intent to treat states differently in important ways from their municipalities or political subdivisions, the language of the statute must be implemented.

For the reasons set forth above, I find that the Town of Bedford is not authorized to maintain an action for natural resource damages under § 9607(a)(4)(C) and that as a municipality it is not entitled under § 9607(a)(4)(A) to have the burden placed on the defendants to demonstrate that its response actions are inconsistent with the NCP. Accordingly, I hereby

ALLOW the motions of the defendants to dismiss Count II of the Complaint;

DENY the motion of the Town of Bedford for leave to amend its Complaint; and

DENY the motion of the Town of Bedford for Partial Summary Judgment or, In the Alternative, Declaratory Relief establishing that it is a "state."