**CITY OF NEW YORK, Plaintiff,**

v.

**CHEMICAL WASTE DISPOSAL CORP., et al., Defendants.**

**No. CV–90–2061 (CPS).**

United States District Court, E.D. New York.

Sept. 28, 1993.

MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiff, the City of New York (the "City"), seeks an order granting summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, against defendants Chemical Waste Disposal Corporation ("Chemical Waste"), Chemical Solvents and Distillers Company ("Chemical Solvents"), Diane Levy and Harvey Licht, as co-executors of the estate of Morris Levy ("Levy"), and Ben LaBarbera ("LaBarbera"), holding them jointly and severally liable under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, for response costs incurred by the City to date in the amount of $1,088,368.90, and declaring defendants jointly and severally liable under CERCLA for all future response costs incurred by the City.[1]

The City contends that the defendants are responsible for the release of toxic and dan-

---

1. While this motion was pending, defendants Chemical Waste and the Levy entered into a consent order with the EPA in which defendants agreed to investigate, monitor, and take corrective measures to contain and remove the hazardous substances released at the facility. In light of the consent order, the City has withdrawn its motion for an injunction; therefore, the only issue to be resolved on this motion is whether the defendants are liable to the City for past and future response costs. *See* Stipulation of Settlement dated April 7, 1993.

gerous chemicals into the environment between 1963 and 1983 at a facility in Astoria, Queens, jointly operated by Chemical Waste and Chemical Solvents located at 42–14 19th Avenue in Astoria, New York (the "facility").[2] The City's motion for summary judgment is granted in part and denied in part.

### Procedural History

The City commenced this action on or about June 18, 1990, naming as defendants Chemical Waste, Chemical Solvents, and Morris Levy seeking a permanent injunction under New York State common law of nuisance and recovery of its response costs under CERCLA. Based upon a Suggestion of Death Upon The Record filed by counsel for defendant Levy on or about January 15, 1991, and information obtained during the first stage of discovery, including a June 1991 deposition of Ben LaBarbera, the City filed an amended complaint on August 27, 1991. The amended complaint added Ben LaBarbera as a defendant and substituted Diane Levy and Harvey Licht, as Co–Executors of the Estate of Morris Levy, for defendant Morris Levy. In addition, the amended complaint alleged that neither Chemical Waste nor Chemical Solvents had maintained separate corporate identities and that they had been operated as a single entity.

Fourteen months after the City filed its original complaint, the United States Environmental Protection Agency ("EPA") commenced an administrative enforcement proceeding pursuant to section 3008(h) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(h), against the two corporate defendants. The EPA proceeding was initiated in large part on the basis of scientific data developed during an investigation conducted by the City's Department of Environmental Protection ("DEP") which the City made available to the EPA. Administrative proceeding was commenced by EPA's issuance of an "Initial Administrative Order" requiring defendants to undertake a remedial action at the facility. Negotiations then began on the terms of an Administrative Order on Consent ("consent order").

After an extended period of negotiation, Diane Levy executed a consent order with the EPA, pursuant to section 3008(h) of RCRA, which directs defendant Chemical Waste to undertake a number of actions under the direction of the EPA to investigate, monitor and take corrective measures to contain and remove the hazardous substances released at the facility.

### CERCLA Statutory Scheme

Congress enacted CERCLA in 1980 to provide a comprehensive response to the release of hazardous substances[3] into the environment. The act provides two mechanisms, one public and one private, which together provide for cleanup, compensation, and liability where there is a threat from hazardous substances. The statute distinguishes between two types of responses: remedial actions (generally long-term or permanent containment or disposal programs, 42 U.S.C. § 9601(24)) and removal efforts (typically short-term cleanup arrangements, 42 U.S.C. § 9601(23)).

Congress pursued two purposes in enacting this legislation: first, to give the federal government the tools necessary to respond promptly and effectively to releases of hazardous substances and, second, to ensure that those responsible for the release of toxic substances into the environment are liable for the cost of cleaning them up. *See generally Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

Section 107(a) of CERCLA authorizes federal, state, or local governments or private parties to sue for the recovery of the

---

**2.** After 1983, Chemical Waste became the only operator at the facility. Chemical Solvents continued to own the real property upon which the facility was located.

**3.** In defining the term "hazardous substance," in section 9601(14), CERCLA incorporates by reference the substances designated as hazardous or toxic under the Clean Air Act, 42 U.S.C. § 7412; the Clean Water Act, 33 U.S.C. §§ 1321(b)(2)(A), 1317(a); Section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921; and the Toxic Substances Control Act, 15 U.S.C. § 2606 (1983) while authorizing EPA to designate additional substances that "may present substantial danger to the public health or welfare or the environment," 42 U.S.C. § 9602(a).

972

costs of response actions taken by them from the persons responsible for the release or threatened release of hazardous substances. 42 U.S.C. § 9607(a); *see also State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1041–1042 (2d Cir.1985). The federal and state governments can recover remedial and removal costs from responsible parties if such efforts are "not inconsistent with the National Contingency Plan ("NCP")." 42 U.S.C. § 9607(a)(4)(A). Any other person who is acting consistent with the NCP may recover any necessary response costs from responsible parties. 42 U.S.C. § 9607(a)(4)(B), *Shore Realty*, 759 F.2d at 1041–1042. A responsible party is also liable for "damages for injury to, destruction of, or loss of natural resources," and "the cost of any health assessment or health effects study...." 42 U.S.C. § 9607(a)(4)(C) & (D). In addition to providing for recovery of response costs already incurred, CERCLA provides for declaratory relief imposing liability for future response costs where some response costs have already been incurred by the party seeking such declaratory relief.

Section 107(a) of CERCLA establishes four classes of responsible persons liable for the costs of responding to releases of hazardous substances form a facility. *See* 42 U.S.C. § 9607(a), *B.F. Goodrich Company v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992). "These include past and present owners or operators of facilities, transporters of hazardous substances, and those ... who generate or arrange for the treatment or disposal of hazardous substances." *Id.; Shore Realty*, 759 F.2d at 1044.

■ CERCLA imposes strict liability on responsible persons, that is, liability without regard for fault. *See Murtha*, 958 F.2d at 1198; *Shore Realty*, 759 F.2d at 1042. Where, as here, the environmental harm is indivisible, CERCLA liability is joint and several. *See Murtha*, 958 F.2d at 1198.

■ CERCLA provides for three defenses to liability under 42 U.S.C. § 9607(a). Section 107(a) states that response cost liability is "subject only to the defenses set forth in subsection (b) of this section." Subsection 107(b) provides that there shall be no liability under subsection 107(a) where the release is due to an act of God, an act of war, or the act or omission of a wholly unrelated third party. 42 U.S.C. § 9607(b). To be entitled to one of these defenses, a person otherwise liable under section 107(a), must "establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by" one or more of such acts or omissions listed above.

## BACKGROUND

The following facts are undisputed except as otherwise noted. Chemical Waste and Chemical Solvents shared common offices at the facility, had the same officers and employees, and in virtually all other respects functioned as a single entity from 1963 to 1983. Morris Levy, deceased, and defendant LaBarbera founded Chemical Waste and Chemical Solvents in 1963. For two decades, defendants Levy and LaBarbera were the sole corporate officers of these companies and were each fifty percent shareholders in Chemical Waste and Chemical Solvents. Levy was the president of Chemical Waste and treasurer of Chemical Solvents; LaBarbera was the president of Chemical Solvents and treasurer of Chemical Waste. During the relevant period, Levy and LaBarbera supervised and directed all day-to-day operations of the facility jointly, including the treatment, storage, and disposal of hazardous wastes at the facility.

The facility is located in a mixed commercial and residential community in Astoria and occupies one-quarter acre of land two blocks south of Bowery Bay. The facility consists of a main warehouse and office building, an equipment storage building, one small masonry building for hazardous waste storage, and a solvent distillation area at its southwest corner (the "still area"). The rest of the facility is an open yard used for hazardous waste staging, loading and unloading, and storage.

The facility also contained a subsurface drainage system during the period 1963 through 1983, which ran under the west side of the facility. The drainage system was comprised of a 4″ cast iron pipe and two

"separator sumps"—small 3' × 3' dirt-bottom pits—and was fed by a series of drains located inside and outside the still area. Liquids in the drainage system flowed north from the still area through the 4" pipe, through the two separator sumps, and discharged to a city sewer located beneath 19th Avenue.

Chemical Waste and Chemical Solvents engaged in two types of operations at the facility during the period 1963 through 1983. One operation involved the storage and repackaging of drummed hazardous wastes. These wastes were transported to the facility by Chemical Waste in its trucks and were then repackaged and resold, if possible, or transported off-facility for disposal (the "repackaging operation"). The other operation was the distillation of waste solvents (the "distillation operation"). Waste solvents were transported to the facility from various customers and then distilled. The distilled solvents were then either returned to the customer for a fee or resold to others.

The City alleges that defendants disposed of hazardous wastes generated from the repackaging and distillation operations into the drainage system at the facility during the relevant period. It is undisputed that the repackaging operations at the facility were conducted in the following manner. Chemical Waste sent its trucks to pick up waste solvents from small volume hazardous waste generators, such as laboratories, schools, hospitals, and small businesses. These wastes were transported to the facility in packed "open head" 55-gallon drums—55-gallon drums packed with smaller jugs with one- to five-gallon capacity. The jugs in any particular drum generally came from a variety of sources and contained a variety of hazardous substances.[4] At the facility, an employee unloaded the 55-gallon drums using a forklift and temporarily placed them on the west side of the facility storage yard. Then an employee unpacked the drums and placed the jugs on a bench for inspection by Levy.

Levy determined the contents of the jugs by smelling them or by using litmus paper. Certain jugs Levy segregated as suitable for repackaging and reshipping; the remainder of the jugs he designated as "pourable." Levy directed that these "pourables" be dumped directly into the separator sumps which comprised a part of the facility drainage system. Every working day for at least five years during the period 1963 to 1983, Levy personally instructed employees at the facility to dispose of approximately twenty of these one- to five-gallon jugs of hazardous waste into the separator sumps.

The defendants also used the three stills at the facility to distill waste solvents. Defendant LaBarbera would contact customers who generated waste solvents. He then either sent Chemical Waste's trucks to pick up the waste solvents or arranged to have the customer deliver the solvents to the facility. Typically, the waste solvents were contained in 55-gallon drums. Unlike the drums used in the repackaging operation, the drums used for the distillation were "closed head" drums. The solvents distilled at the facility included those described in footnote 2 above.

After each distillation run, the still operators cleaned the still chamber to remove the still bottoms remaining in the distillation chamber. The still bottoms consisted of solvents, oil, paint, debris and other substances that had been mixed with the waste solvents before distillation. Still bottoms generated from the distillation of solvents are listed hazardous wastes under 40 C.F.R. § 261.31. Relying on the deposition of Thomas Ingram, an employee of Chemical Waste and Chemical Solvents since 1976, the City contends that under LaBarbera's personal supervision the still operators cleaned the distillation chambers by connecting one end of a hose to a valve at the bottom of the still chamber and hooking the other end to a fitting on a drain feeding the facility drainage system. Amato Aff. Ex. I at 41–45. According to Ingram's deposition, the still operator then opened the

4. These hazardous substances included: tetrachloroethylene; trichloroethylene; methylene chloride; 1,1,1–trichloroethane; carbon tetrachloride; chlorinated fluorocarbons; chlorobenzene; 1,2,2–trifluoroethane; orthodichlorobenzene; trichlorofluoromethane; 1,1,2–trichloroethane; acetone; xylene; ethyl acetate; ethyl benzene; ethyl ether; methyl isobutyl ketone; n-butyl alcohol; cyclohexanone; methanol; toluene; methyl ethyl ketone; carbon disulfide; isibutanol; pyridine; benzene; 2–ethoxyethanol; 2–mitropropane; acetone; and "paint thinners".

valve and allowed the still bottoms to run directly from the still chamber into the drainage system. *Id.* Ingram stated that the still bottoms generated from the distillation of waste solvents were disposed of at the facility in this manner each day. *Id.*

Defendant LaBarbera denies that he ever supervised the improper disposal of still bottoms at the facility. He also denies that he was ever involved directly or indirectly in the release of any hazardous substances. He contends that, if hazardous substances were released at the facility, the release occurred after he ended his association with Chemical Waste and Chemical Solvents in December 1983, when he sold his interest in the companies to Levy.

The waste solvents and still bottoms disposed of at the facility were released into the environment in two ways. First, waste solvents and still bottoms were permitted to collect in the separator sumps. Some of these wastes leached through the dirt floors and the concrete walls to the separators into the surrounding soils and groundwater. Second, the waste materials that did not leach out of the separator sumps were discharged from the facility by filling the sumps up to the level of the 4″ pipe and flushing the water/solvent mixture through the pipe and into the city sewer system.

The DEP did not discover defendants' practices until June 6, 1985, when DEP was contacted by personnel of the City's Department of Transportation who were engaged in a sewer construction project on 19th Avenue in Astoria. According to the DOT employees, in the course of excavating a trench on 19th Avenue between 42nd and 43rd streets, workers experienced a strong chemical odor emanating from the trench. The workers complained of headaches, rashes, and nausea. The consultant engineer on the project thereafter ordered all work in the trench to stop and asked DEP to inspect the facility.

DEP employees inspected the facility on June 7, 1985, and discovered dangerous levels of volatile contaminants in the trench. The chemicals that DEP found in its preliminary investigation of the soil and the groundwater in the trench were the same chemicals the defendants treated and stored at the facility. The connection between the facility and the contamination lead DEP to hire an environmental consulting firm called NEPCCO, Inc. ("NEPCCO") to conduct a subsurface hydrogeologic investigation of the area around the facility and on the site of the facility.

After a hydrogeologic investigation that lasted from October 1985 until February 1986, NEPCCO concluded that the hydraulic gradient in the area of 19th Avenue was such that groundwater beneath the facility flowed in the direction of 19th Avenue and Bowery Bay. NEPCCO also concluded that the groundwater analytical results demonstrated a progression of dissolved volatile organic compounds from the interior of the site towards the trench area on 19th Avenue. This lead NEPCCO to conclude that facility was the source of the contamination. The NEPCCO report also concluded that the release of contaminants from the facility was "recent" and "continuous." The NEPCCO employee who drafted this part of the report testified that by "recent" he meant that the release began at least two years and probably five years or more prior to NEPCCO's investigation.

In April 1987 the construction of the sewer main on 19th Avenue resumed following the development of a health and safety plan for the construction workers on the project. During the period of construction, a DEP inspector made biweekly visits to the facility to measure vapors in the trench area. When measured readings of these vapors exceeded background levels, respirators and on-site fans were employed to prevent construction workers from inhaling the harmful vapors. In addition, DEP recommended that the workers wear protective clothing at all times during construction. DOT finished installing the sewer main in September 1988.

In addition to the testing performed by NEPCCO and DEP, NYTEST Environmental, Inc. ("NYTEST") and Clean Harbors, Inc. conducted soil samplings in and around the facility. The soil analyses performed by NYTEST revealed the presence of polychlorinated biphenyls ("PCBs") at a concentration of 94 ppm and the presence of chlorinat-

ed and non-chlorinated organic compounds. The soil analyses performed by Clean Harbors revealed that during the second round of soil samplings the highest concentrations of contaminants including 1,1,1–trichloroethane, trichloroethane, and tetrachloroethane were taken from a location directly in front of the facility. The results of the investigations and tests conducted by NEPCCO, NY-TEST, Clean Harbors, and DEP confirmed the conclusion that the source of the chemical contamination in the vicinity of 19th Avenue was the facility.

According to the City's expert, Cyprian Cox, the chemicals detected in the soils and groundwater at and near the facility are extremely toxic and pose a significant threat to public health and environment.[5] The most significant receptor of contamination from the facility is the 19th Avenue sewer line. Due to its location down hill from the facility and the fact that the sewer line is permeable, the contaminant plume from the facility in all likelihood flows into the sewer line pathway and infiltrates the sewer line through its seams and joints. Once inside the sewer line, the contaminants can migrate into residential and commercial structures through their sewer connections. Humans may then be exposed to these contaminants either through direct inhalation or through dermal skin absorption.

In response to the contamination encountered on 19th Avenue, the City, through DOT and DEP, undertook a number of steps intended to either assess the source, nature, and extent of contamination discovered during excavation of the trench or to minimize risks to workers and the public at large during the completion of the contract work in the contaminated area.

First, the City paid $35,651.42 for the investigation performed by NEPCCO at the request of DEP to determine the nature and extent of groundwater and soil contamination in the area where work had been stopped.

Second, the City spent $169,070.06 to secure the contaminated area. The security measures included: partial backfilling of the trench, stationing of two security guards providing a 24–hour watch to limit public access to the trench, building a fence around the contaminated area, and rental and purchase of metal plates to cover the intersections of 42nd Street and 19th Avenue and 43rd Street and 19th Avenue to minimize the risk of pedestrians or automobiles falling into the trench.

Third, the City spent $524,852.49 to supply and place interlocking steel sheeting in the trench.

Fourth, the City spent an additional $267,507.08 to complete installation of steel "cells" in the trench.

Fifth, the City spent $7,423.35 for additional testing to determine the toxicity of the soil underneath the temporary pavement that had been installed on 19th Avenue between 42nd and 43rd streets.

To date the total response costs incurred by the City due to the release of hazardous

5. According to the affidavit submitted by Cyprian Cox in support of the City's motion for summary judgment the following chemicals detected at or near the facility pose a significant threat to the public health and the environment:

1. Trichloroethylene, Methylene Chloride and Tetrachloroethylene have adverse affects on the human nervous system. Acute exposure to these substances can cause headache, dizziness, nausea, unconsciousness and death. All three substances are potential human carcinogens.

2. Benzene is a known human carcinogen. Acute exposure can cause asphyxiation, respiratory arrest, central nervous system depression and cardiac arrhythmia.

3. 1,2–dichloroethane can cause nausea, headaches, dizziness and liver and kidney damage. Prolonged exposure can cause pulmonary edema resulting in death. It is also a potential human carcinogen.

4. Exposure to 1,1,1–trichloroethane can result in liver and kidney damage, cardiac arrhythmia, unconsciousness and death.

5. Toulene and Xylene can irritate the eyes, nose and throat and cause dizziness, unconsciousness and death. Toulene and Xylene are mutagenic; repeated exposure can damage bone marrow, causing low blood cell count.

6. Vinyl Chloride is a human carcinogen. Repeated exposure can cause stomach, kidney and liver damage and may also result in damage to the nervous and circulatory systems.

7. PCBs primarily affect the liver and cutaneous tissues. Exposure to PCBs has been associated with liver damage, and dermatological effects such as skin irritation and chloracne.

substances from the facility is $1,088,368.90. That figure includes $83,862.50 in attorneys' fees incurred in prosecuting this action.

## DISCUSSION

■ Summary judgment must be granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any disputed material facts, *see Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990), and the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See id.*

The showing needed on summary judgment reflects the burden of proof in the underlying action. The court must consider "the actual quantum and quality of proof" demanded by the underlying cause of action and which party must present such proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 265 (1986). Therefore, where the ultimate burden of proof is on the nonmoving party, the moving party meets his initial burden for summary judgment by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 202 (1986). To survive the motion, the nonmoving party must then "make a showing sufficient to establish the existence of [the challenged] element essential to [that party's] case." *Id.,* at 322, 106 S.Ct. at 2552. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.,* at 587, 106 S.Ct. at 1356.

■ As a preliminary matter, the Court must determine the applicable burden of proof and persuasion since both sides say the other is responsible for the failure of any showing as to the reasonableness and necessity of the costs incurred. In an action brought by the federal government or a state pursuant to section 107(a)(4)(A), the burden is on the defendant to prove that the removal or remedial actions undertaken by the federal government or state were excessive or unnecessary and thus inconsistent with the NCP. In this sense, the response costs of the federal government and state governments are entitled to a presumption of consistency with the NCP which a defendant must overcome. All parties not included under section 107(a)(4)(A) must sue under section 107(a)(4)(B) to recover response cost and are required to prove that their costs of response were necessary and consistent with the NCP in order to establish a *prima facie* case for response costs.

■ The City argues that it should be treated like a state under section 107(a)(4)(A) of CERCLA and have its response costs presumed to be consistent with the NCP. In support of this argument the City points to the many sections of CERCLA in which governmental entities—federal, state, and local governments—are granted special authority and power not available to private parties. The City contends that the differences in the way in CERCLA treats federal, state, and local governments on the one hand and private parties on the other support its interpretation that it is entitled to the presumption of consistency with the NCP that the federal government and state governments enjoy.

Defendants argue that the City should be treated as a private party under section 107(a)(4)(B) of CERCLA and is not entitled to the presumption that its costs of response are consistent with the NCP. Defendants support that contention by relying on two district court decisions from other jurisdictions, *Town of Bedford v. Raytheon Co.,* 755 F.Supp. 469 (D.Mass.1991) and *City of Philadelphia v. Stepan Chemical Co.,* 713 F.Supp. 1484 (E.D.Pa.1989), in each of which the court held that a city is not a state for the purposes section 107(a)(4)(A) of CERCLA.

■ The interpretation of a statute must begin with the language of the statute itself, *Touche Ross v. Redington,* 442 U.S. 560, 566,

99 S.Ct. 2479, 2484, 61 L.Ed.2d 82 (1979), "and absent a clearly expressed legislative intention to the contrary," a court should generally assume that Congress expresses its purposes through the ordinary meaning of the words it uses. *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984). This effort is complicated under CERCLA because it "is far from being a model of statutory or syntactic clarity." *City of New York v. Exxon Corp.,* 633 F.Supp. 609, 613–614 (S.D.N.Y.1986) (Weinfeld, J.) (*Exxon I* ).

> CERCLA defines "state" as follows:
>
> The terms 'United States' and 'State' include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction.

42 U.S.C. § 9601(27). By its terms, CERCLA's definition of "state" does not include political subdivisions such as municipalities. The entities that are included under this definition differ substantially from political subdivisions in terms of their authority and power. All the entities included in subsection 101(27) are sovereigns and, unlike municipalities, do not depend on states for their authority to govern.[6] Municipalities and other political subdivisions are included within the definition of the term "person" set out in 42 U.S.C. § 9601(21)[7]. As outlined above, the presumption of consistency with the NCP set out in section 107(a)(4)(A) applies to response actions by the United States Government, States, and Indian tribes. The requirement that the plaintiff prove that its response actions are consistent with the NCP set out in section 107(a)(4)(B) applies to "any other person" not named in section 107(a)(4)(A). Thus, according to the plain language of section 107(a), Congress intended to have a municipality's entitlement to recover response costs determined under section 107(a)(4)(B), instead of section 107(a)(4)(A).

As the City notes, however, CERCLA does not, in many respects, treat cities or local governments like private parties. For example, section 104(d), 42 U.S.C. § 9604(d), empowers states and their political subdivisions to enter into cooperative agreements with the EPA to engage in cleanup activities and to share the costs of cleanup. Private parties have no such power. Other examples of how CERCLA treats states and their political subdivisions similarly include section 104(i)(6)(E), 42 U.S.C. § 9604(i)(6)(E); section 104(i)(15), 42 U.S.C. § 9604(i)(15); section 111(c)(11), 42 U.S.C. § 9611(c)(11); and section 123(b)(1), 42 U.S.C. § 9623(b)(1).

Although the structure of CERCLA supports the City's contention that it is not in many respects a private party, it does not support the conclusion that it should be treated as a state for the purposes of section 107(a)(4). Indeed, the fact that Congress explicitly decided to mandate similar authority to states and their political subdivisions, explicitly in some sections of CERCLA and not in others, buttresses defendants' argument that, given the differences in language between section 107(a)(4)(A) and 107(a)(4)(B), Congress intended to treat states and their political subdivision differently with regard to the NCP. "[W]here Congress includes

---

6. In New York State all of New York City's powers to act in local matters have been delegated to it by the state constitution and legislature. *See N.Y. Const.* art. IX, § 2. "[L]awmaking authority of a municipal corporation, which is a political subdivision of the State, can be exercised only to the extent it has been delegated by the State." *Albany Area Builders Association v. Town of Guilderland,* 74 N.Y.2d 372, 547 N.Y.S.2d 627, 546 N.E.2d 920 (1989) (Kaye, J.); *see also, City of New York v. State of New York,* 76 N.Y.2d 479, 561 N.Y.S.2d 154, 562 N.E.2d 118 (1990); *see generally* Frug, "The City as a Legal Concept," 93 Harv.L.Rev. 1057, 1109–15 (1980)

(noting that one of the most settled principles of municipal law in the United States is Dillon's Rule which provides that local governments are the instruments of the State, and that they derive their governing power entirely from the state).

7. CERCLA defines the term "person" to mean—

an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body. 42 U.S.C. § 9601(21).

particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983).

Plaintiff also relies on the court's decision in *Exxon*, 697 F.Supp. 677 (S.D.N.Y.1988) (Conboy, J.) (*Exxon II*), to support its claim that the City should be treated like a state under section 107(a)(4)(A). In *Exxon II*, a proposed settlement between the City and seven defendants was challenged by two non-settling parties on the ground that, *inter alia*, the City lacked standing to sue under section 107(a)(4)(A) and could only proceed as a private party under 107(a)(4)(B). The challenging parties argued that the settling defendants were not entitled to protection from claims for contribution regarding matters addressed in their settlement with the City under section 113(f)(2), because that provision only provides such protection to parties settling with the United States or a state.

Judge Conboy rejected the challenge of the non-settling parties to the City's standing under section 107(a)(4)(A) for the purposes of settlement under section 113(f)(2). The court reasoned that "to deny the settling parties the statutory benefits of section 113(f)(2) under these circumstances would be unduly formalistic." *Exxon II*, 697 F.Supp. at 686. He concluded, after analyzing the many other provisions of CERCLA which place local governments on the same footing as state and federal authorities and from the Act's overall treatment of local governments, that "it is clear that political subdivisions are not relegated to the role of private parties under the Act...." *Id.*, at 685.

This Court is not persuaded that the reasoning of *Exxon II* is applicable here. Judge Conboy reasoned that the overreaching purposes of CERCLA are served by reading sections 107(a) and 113(f)(2) broadly because such a reading would facilitate settlement of the case between the City and multiple polluters. Clearly this reading of these two sections for the purposes of settlement is consistent with the objectives of CERCLA, but to interpret section 107(a)(4) in such a way as to relieve local governments of the burden of proving that their costs of response are consistent with the NCP is an interpretation not only unsupported by the language of the statute but also not necessarily consistent with the objectives and policies underlying CERCLA. Accordingly, I conclude that the language of section 107(a)(4) requires that the City bear the same burdens of proof and persuasion as any other person seeking response costs, as provided by section 107(a)(4)(B) of CERCLA.

According to section 107(a)(4)(B) of CERCLA the elements required to present a prima facie cause of action for liability for response costs are: (1) that the defendant fits into at least one of the four classes of responsible parties set forth in 42 U.S.C. § 9607(a),[8] (2) that the facility at which the hazardous substances were disposed is a "facility" as defined in 42 U.S.C. § 9601(9), (3) that there has been a release or threaten release of hazardous substances into the environment from the facility, and (4) that plaintiff incurred necessary costs responding to a release or threatened release consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B);

---

8. The four classes of covered parties under Section 9607(a) are:

    (1) the owner and operator of a vessel or a facility,

    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

    (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter of transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

    (4) any person who accepted or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(1)–(4).

see *Amoco Oil Company v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989).

None of the defendants dispute that the City has satisfied elements 2 and 3 of the *prima facie* case. The disputes with regard to CERCLA involve the first and the fourth elements of the *prima facie* case. LaBarbera argues that the City has not established that he was a "covered person." All of the defendants contend that the City has not proven that its response costs were consistent with the NCP.

■ Defendant LaBarbera argues that the City has not established the first element of the *prima facie* case for liability under CERCLA against him. LaBarbera argues that he is not an "operator" under section 9607(a)(2) of CERCLA, because he had no connection to Chemical Solvents or Chemical Waste after 1983 and because plaintiff has not established in its motion for summary judgment that the response costs that it has incurred were the result of a release or a threatened release which took place prior to December 1983. Instead, defendant LaBarbera contends that the release occurred as a result of the activities of New York City's contractor in digging the ditch in 1985.

LaBarbera argues that there is a material issue of fact as to whether he can avoid liability under the affirmative defense set out in section 107(b)(3) of CERCLA, which provides in relevant part:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the

character of such hazardous substances, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3).

LaBarbera contends that a genuine issue of material fact exists as to whether the acts of the plaintiff's contractor, Andrew Catopano Enterprises,[9] caused the release of hazardous substances into the environment.

LaBarbera's argument that there is a material issue of fact as to who caused the release of hazardous substances at the facility and when is not supported by the undisputed facts of this case. It is clear from the papers he submitted in opposition to plaintiff's motion that he misconceives the nature of the releases at issue in this litigation. Although the City discovered evidence of substantial and continuous releases of hazardous substances and continuous releases of hazardous substances into the environment at the facility during the sewer construction project on 19th Avenue, the discovery of these releases was not a release in and of itself. It is undisputed that, while LaBarbera was a fifty-percent owner and operator of the facility, hazardous substances were disposed of at that site. Therefore, the Court concludes that as a matter of law LaBarbera cannot establish by a preponderance of the evidence that a third party was the cause of the releases of hazardous substances at issue here.

LaBarbera's arguments, however, do not create an issue of material fact because he concedes that from 1963 until 1983 he was an "operator" and fifty-percent owner of the facility. The City has presented undisputed evidence that during that time hazardous substances were disposed of at that facility. CERCLA imposes strict liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of"; therefore, these two facts are all that plaintiff needs to establish that

9. The company hired to complete the 19th Avenue sewer construction project.

LaBarbera was a covered person under section 107(a). 42 U.S.C. § 9607(a)(2).

■■■■■■ To establish the final element of the *prima facie* case for liability under CERCLA, the City must show that it has incurred "necessary response costs" which are "consistent with the NCP." 42 U.S.C. § 9607(a)(4)(B). The costs of initial investigation and monitoring of a release are recoverable, however, without such a showing. *Gache v. Town of Harrison, N.Y.*, 813 F.Supp. 1037, 1046 (S.D.N.Y.1993) ("initial preliminary investigatory and monitoring costs are recoverable irrespective of the recoverability of other costs or compliance with the requirements of the NCP"); *see also Carlyle Piermont Corp. v. Federal Paper Bd. Co.*, 742 F.Supp. 814, 821 (S.D.N.Y.1990); *Artesian Water Co. v. Gov. of New Castle County*, 659 F.Supp. 1269, 1294 (D.Del.1987). Moreover, contrary to the arguments of defendants Levy, Chemical Waste, and Chemical Solvents, initial monitoring, assessment, and evaluation expenses are recoverable even absent any subsequent recoverable response costs. *See Artesian Water Co. v. Government of New Castle County*, 851 F.2d 643, 651 (3rd Cir.1988); *see also Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986); *Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 795 (D.N.J.1989). Therefore, defendants are liable for plaintiff's investigation and monitoring costs without considering compliance with the NCP.

Here plaintiff has documented costs of preliminary investigation and monitoring of $35,-651.42 and is entitled to summary judgment on liability against the defendants for its $35,651.42 in preliminary investigation and monitoring costs. The costs were incurred in response to releases of hazardous substances, and all the defendants are responsible persons because they owned and operated the facility from which such releases occurred at the time of such releases. *See Amoco Oil*, 889 F.2d at 668.

■■■■ With regard to the balance of the City's response costs, all defendants claim that there are issues of material fact as to whether the costs were necessary and consistent with the NCP and that the City has now shown that it is entitled to judgment as a matter of law. The City has advanced no argument concerning the necessity or the consistency of its response costs with the NCP. Instead, except to contend that its response actions to date were removal actions and not remedial actions as defined by the EPA, the City has relied solely on the argument rejected above that it should be entitled to the presumption of consistency with the NCP that states and the federal government enjoy.

Even assuming that the City's expenses involved removal actions, it must come forward with a showing that its removal actions substantially comply and were consistent with the NCP. To do this, it must show the it "act[ed] in circumstances warranting removal and implement[ed] removal action consistent with section 300.65.[10] " 40 C.F.R.

---

10. The pertinent portions of section 300.65 read as follows:

(a)(1) In determining the appropriate extent of action to be taken at a given release, the lead agency shall first review the preliminary assessment and the current site conditions to determine if removal action is appropriate.

(2) Where the responsible parties are known, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to have them perform the necessary removal actions. Where responsible parties are unknown, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to locate them and have them perform the necessary removal action....

(b)(1) At any release, where the lead agency determines that there is a threat to public health or welfare or the environment, based on the factors of paragraph (b)(2) of this section, the lead agency may take any appropriate action to abate, minimize, stabilize, mitigate, or eliminate the release or threat of release....

(2) The following factors shall be considered in determining the appropriateness of a removal action ...:

(i) Actual or potential exposure to hazardous substances of pollutants or contaminants by nearby populations, animals, or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

§ 300.71(a)(2)(i) (1986). The City has not even made an argument that its removal actions were consistent with the NCP and has instead relied solely on its argument that it is entitled to the presumption of consistency with the NCP that states and the federal government enjoy. Therefore, although the City has described its response costs in detail and has presented the affidavit David Arabi to support its claim for response costs, it has not addressed the issue of consistency with the NCP. Therefore, this Court cannot grant the City's motion for summary judgment with regard to the balance of its response costs.[11] Accordingly, plaintiff's motion for summary judgment is denied with respect to all the costs its seeks with the exception of the $35,651.42 it expended on preliminary investigative actions, without prejudice to its renewal to make a showing that its costs were consistent with the NCP.

■ The City seeks attorneys' fees as response costs under CERCLA. According to an affidavit submitted by Michael Bogin, the City has incurred attorneys' fees of $83,862.50. The City argues that, since is entitled to seek response cost under section 107(a)(4)(A) like a state or the federal government, it is entitled to recover attorneys' fees as response costs under CERCLA. *See* 42 U.S.C. § 9607(a)(4)(A). Defendants argue

that as "any other person" entitled to sue for response costs under section 107(a)(4)(B), the City is not entitled to recover attorneys' fees as response costs. The City has not addressed the issue whether it is entitled to attorneys' fees under section 107(a)(4)(B).

The two cases the City relies on to support its application for attorneys' fees are *Jersey City Redevelopment Authority v. PPG Industries*, 655 F.Supp. 1257 (D.N.J.), *aff'd*, 866 F.2d 1411 (3rd Cir.1988) and *Key Tronic Corp. v. United States*, 766 F.Supp. 865 (E.D.Wash.1991). These cases do not support the City's position. *Jersey City* does not hold, as the City contends, that attorneys' fees related to litigation are recoverable costs of response under CERCLA. Indeed, in *Jersey City*, the court does not address the issue of whether attorneys' fees are recoverable as response costs. In *Key Tronic Corp.*, the trial court held that a party seeking response costs under section 107(a)(4)(B) of CERCLA to recover attorneys' fees as necessary response costs. *Key Tronic Corp.*, 766 F.Supp. at 872. This decision was recently reversed by the Court of Appeals for the Ninth Circuit in *Key Tronic Corp. v. United States*, 984 F.2d 1025 (9th Cir.1993). The Court of Appeals in that case relied on *Stanton Road Associates v. Lohrey Enter.*, 984 F.2d 1015 (9th Cir.1993), in which

(vi) Threat of fire or explosion;
(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;
(viii) Other situations or factors which may pose threats to public health or welfare or the environment. . . .
(c) The following removal actions are, as a general rule, appropriate in the following situations:
(1) Fences, warning signs, or other security or site control precautions—where humans or animals have access to the release;
(2) Drainage controls (e.g. run-off or run-on diversion)—where precipitation or run-off from other sources (e.g. flooding) may enter the release area from other areas;
(3) Stabilization of berms, dikes, or impoundments—where needed to maintain the integrity of the structures;
(4) Capping of contaminated soils or sludges—where need to reduce migration of hazardous or pollutants or contaminants into soil, groundwater, or air; . . . .
40 C.F.R. § 300.65 (1986).

11. In addition, Defendants argue that are issues of material fact as to whether the Cities response costs are consistent with the NCP. Defendants argue the installation of the steel sheeting and the creation of the cells was not a cost effective method to respond to the discovery of the hazardous substances at the 19th Avenue Sewer Construction Project. Defendants Levy, Chemical Waste, and Chemical Solvents argue that the installation of the steel sheeting was not an action taken in response to a release or a threatened release of hazardous substances. They rely on the depositions of non-party witnesses Joseph DeRicco, Anthony Masciocco, John Ruggiero to support their contention that the reason they installed the steel sheeting was that there was groundwater was encountered in the trench—not that there was a release or threat of release of hazardous substances from the CWD facility. Defendants Levy, Chemical Waste, and Chemical Solvents also argue that the fact that the steel sheeting was ineffective in keeping the contaminated groundwater out of the trench, and that the City pumped the contaminated groundwater from the trench into the sewer was inconsistent with the NCP.

it held that a litigant cannot recover in a section 107(a)(4)(B) response action attorneys' fees from a party that was responsible for causing the release of hazardous substances into the environment, to conclude that district court in *Key Tronic Corp.* lacked the authority to award attorneys' fees. *Key Tronic Corp.* 984 F.2d at 1027. The *Key Tronic* court concluded that, since Congress has not explicitly authorized parties entitled to response costs under section 107(a)(4)(B) to recover their legal expenses as response costs, the district court erred in making an award of attorneys' fees.

The courts that have considered the issue of whether attorneys' fees are recoverable by a party entitled to response costs under section 107(a)(4)(B) have split on the issue. *Compare FMC Corporation v. Aero Industries, Inc.*, 998 F.2d 842 (10th Cir.1993) (holding the a party entitled to response costs under section 107(a)(4)(B) may not recover attorneys' fees arising out of litigation to recover response costs); *In re Hemingway Transport, Inc.*, 993 F.2d 915, 934 (1st Cir. 1993) (same); *Key Tronic Corp.*, 984 F.2d at 1027 (declining to award attorneys' fees under section 107(a)(4)(B) of CERCLA); *Stanton Road Associates*, 984 F.2d at 1017–20 (same) *with Donahey v. Bogle*, 987 F.2d 1250, 1256 (6th Cir.1993) (allowing the recovery of attorneys' fees); *General Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1422 (8th Cir.1990) (same), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991). Although the Court of Appeals for the Second Circuit has not addressed this issue, this Court is persuaded by the analysis used by the majority of district judges in this circuit who have explicitly considered this issue and concludes that attorneys' fees are not recoverable as response costs by a party entitled to sue under section 107(a)(4)(B) of CERCLA. *See Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 802 F.Supp. 943, 945–47 (W.D.N.Y.1992); *Leonard Partnership v. Town of Chenango*, 779 F.Supp. 223, 229–30 (N.D.N.Y.1991); *State of New York v. SCA Servs., Inc.*, 754 F.Supp. 995, 1000 (S.D.N.Y. 1991). *But see Shapiro v. Alexanderson*, 741 F.Supp. 472, 480 (S.D.N.Y.1990).

■ Under the American Rule, a prevailing party may not recover attorneys' fees from the losing party. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Moreover, "the law of the United States ... has always been that absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation." *Runyon v. McCrary*, 427 U.S. 160, 185, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976). Therefore a determination of whether the City is entitled to attorneys' fees under section 107(a)(4)(B) requires an examination of the provisions of CERCLA.

Under section 107(a)(4)(B), as discussed above, the City may recover the "necessary costs" of responding to a release or a threatened release of hazardous substances into the environment. CERCLA defines "response" as "remove, removal, remedy, remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25); *Alloy Briquetting Corp.*, 802 F.Supp. at 945. Therefore, the question becomes "whether attorney fees are recoverable as 'necessary costs' of 'enforcement activities' related to the removal of hazardous substances." *Alloy Briquetting*, 802 F.Supp. at 945.

The phrase "enforcement activities" is not self-explanatory and does not explicitly signal with any persuasive degree of clarity that Congress intended to provide for an award of attorneys' fees to litigants suing for response costs under section 107(a)(4)(B). *See Stanton Road Associates*, 984 F.2d at 1019. Therefore, this term must be examined in light of the legislative history of CERCLA. CERCLA's legislative history reveals that Congress intended to enable states and the federal government to recover legal costs associated with site remediation but did not grant the same privilege to private parties. *See generally Alloy Briquetting*, 802 F.Supp. at 946 (discussing legislative history).

The Report of the House Committee on Energy and Commerce regarding H.R. 2817 explains that the addition of this language 'will confirm EPA's authority to recover costs for enforcement actions taken

against responsible parties.' H.R.Rep. No. 253, 99th Cong., 1st Sess., pt. 1 at 66, *reprinted in* 1986 U.S.CODE CONG. & ADMIN. NEWS 2835, 2848–49. Significantly, no mention is made of 'enforcement action' undertaken by private parties, and the amendment appears to relate only to cost recovery actions undertaken [pursuant to] 42 U.S.C. § 9607(a)(4)(A), which imposes liability for 'all costs of removal or remedial action incurred by the United States Government of a States or and Indian Tribe....'

*Id.*

Moreover, although CERCLA does allow the City to recover response costs from a private responsible party, its statutory scheme does not enable the City to enforce CERCLA's cleanup provisions against a private entity. *See Leonard Partnership*, 779 F.Supp. at 299. Therefore, the absence of a more explicit statutory grant of the right to recover attorneys' fees leads this Court to conclude that such fees are not recoverable under section 107(a)(4)(B) of CERCLA.

## CONCLUSION

For the reasons stated above, the City's motion for summary judgment is granted with regard to all defendants, jointly and severally, for the $35,651.42 it incurred in preliminary investigatory expenses and monitoring. Its motion is denied with regard to the other response costs it seeks, without prejudice to its renewal to present evidence that its removal costs were necessary and consistent with NCP. Plaintiff's request for attorneys' fees is also denied. To the extent that the City can prove that future costs of response are necessary and consistent with the NCP, it is entitled to collect these costs from the defendants.

SO ORDERED.